UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                              Chapter 7

Alexandria Hutchinson,                              Case No. 12-44688

            Debtor.                                 Hon. Phillip J. Shefferly
_____/

**OPINION REGARDING UNITED STATES TRUSTEE'S MOTION
FOR RELIEF AGAINST BANKRUPTCY PETITION PREPARERS**

**Introduction**

This opinion addresses multiple requests for relief by the United States Trustee ("UST")
under § 110 of the Bankruptcy Code against four separate individuals, Joseph Tillman, Charles
Sullivan, Kenneth Scales and Aleia Renfro (collectively, "Respondents"). The UST requests that
the Court impose fines, sanctions and other forms of relief against the Respondents because they
have acted as bankruptcy petition preparers in numerous cases in violation of various provisions of
§ 110, both individually and acting in concert with one another. The UST filed motions in 13
separate bankruptcy cases. Because there are common issues of law and fact, the Court granted the
UST's request to conduct consolidated hearings on these motions. For the reasons set forth in this
opinion, the Court grants in part and denies in part the UST's motions and imposes fines, sanctions
and other remedies pursuant to § 110 against each of the Respondents upon the terms described in
this opinion.

**Jurisdiction**

This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), over which the Court has
jurisdiction pursuant to 28 U.S.C. §§ 1334(a) and 157(a).

## Background and Procedural History

The procedural history regarding the UST's requests for relief against the Respondents is complicated. The starting point is a declaration filed by Alexandria Hutchinson ("Hutchinson") in her pro se Chapter 7 case no. 12-44688.

In the Eastern District of Michigan, pro se debtors are required by L.B.R. 1007-1(b) to file a "Declaration Under Penalty of Perjury for Debtor(s) Without An Attorney" ("Local Declaration").[1] The Local Declaration requires a debtor to state whether they had help in preparing the documents for their bankruptcy case. If the debtor did have help, the Local Declaration then requires the debtor to state who helped the debtor and provide such person's address, telephone number and social security number. Finally, the Local Declaration requires the debtor to state what the debtor gave or promised to give to the person helping the debtor. The person helping the debtor must also sign the Local Declaration.

Hutchinson filed her case on February 29, 2012. On the same day, Hutchinson filed a Local Declaration (ECF No. 4) stating that she did not have any help in preparing the documents for her bankruptcy filing, and that she did not pay or promise to pay anyone for help in connection with her bankruptcy filing. A few weeks later, on April 6, 2012, Hutchinson filed an amended Local Declaration (ECF No. 16) that was much different. Hutchinson's amended Local Declaration stated that she did have help in preparing her bankruptcy documents, and that the help was provided to her by Charles Sullivan. Also, Hutchinson stated that she paid Sullivan $500.00 for his help. However, Hutchinson did not list an address, telephone number or social security number for Sullivan.

---

[1] The Local Declaration is a separate requirement from Official Bankruptcy Form B19, which bankruptcy petition preparers are required to file pursuant to § 110(h)(2) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 2016(c).

Further, Hutchinson stated that Sullivan "refused" to sign her amended Local Declaration. On the same day, Hutchinson also filed Official Form B19 (ECF No. 17), which also stated that Sullivan "refused" to sign that form.

Hutchinson's amended Local Declaration raised a number of red flags. First, it showed a lack of compliance with § 110(h)(2)'s requirement that a bankruptcy petition preparer file Official Bankruptcy Form B19, disclosing under penalty of perjury any fee received by the bankruptcy petition preparer, and setting forth other information required by statute. A bankruptcy petition preparer cannot refuse to sign this form. Second, as noted, L.B.R. 1007-1(b) also requires that the Local Declaration be signed by the bankruptcy petition preparer as well as by the debtor. A bankruptcy petition preparer cannot refuse to sign this form either. Third, Administrative Order No. 10-21 entered by the Bankruptcy Court for the Eastern District of Michigan on April 20, 2010 sets a presumptive maximum allowable fee of $100.00 chargeable by a bankruptcy petition preparer, and provides that a bankruptcy petition preparer who charges a fee in excess of that amount must file a motion with the Court, accompanied by an affidavit setting forth the facts supporting the higher fee. Although Hutchinson's amended Local Declaration stated that she paid Sullivan $500.00, Sullivan did not file the required motion and affidavit. As a result of these red flags, the Court entered an order (ECF No. 22) directing both Hutchinson and Sullivan to appear at a hearing at which Sullivan would be required to show cause why he should not have to disgorge the fee paid to him by Hutchinson.

The Court held the show cause hearing on May 7, 2012. Hutchinson, Sullivan and the UST all appeared at the hearing. Although the Court did not take evidence, the Court did permit Hutchinson, Sullivan and the UST to each address the Court. Hutchinson explained to the Court that

she filed the amended Local Declaration because she was concerned about committing "perjury." (Exhibit 19 at 3:9.) Hutchinson acknowledged that she did have help in filing her bankruptcy, and that her original Local Declaration was not truthful. Hutchinson then detailed step by step who helped her with her bankruptcy case, what they did, and what they charged. She named some other individuals in addition to Sullivan.

Sullivan admitted that he recognized Hutchinson, but said that he did not actually help prepare her bankruptcy filing. Sullivan said the only thing he did for Hutchinson was to pull a credit report and some forms. He acknowledged that Hutchinson came to his office, but indicated that she met with someone named Ken, and that Hutchinson's bankruptcy papers were prepared by a paralegal by the name of Aleia. Sullivan was imprecise in describing both his relationship with Ken and Aleia and what each of them did for Hutchinson. Sullivan mentioned one other individual, Joseph Tillman. According to Sullivan, the office where he met Hutchinson and where Aleia and Ken worked, was in space that was rented by Tillman. Although he was evasive about what each of them did at the office, Sullivan acknowledged that he worked out of that office along with Ken, Aleia and Tillman. Also, he admitted that Hutchinson signed a contract and that Sullivan gave her a receipt marked "paid in full." (Exhibit 19 at 32:1-2.)

The UST informed the Court that Tillman was well known to the UST as a bankruptcy petition preparer, and that he was involved in many cases. The UST also explained that because of Tillman's previous failures to comply with § 110 of the Bankruptcy Code, the UST had filed adversary proceeding no. 10-4034 against Tillman, and that Tillman, represented by counsel, agreed to a consent judgment ("Consent Judgment") in that adversary proceeding on July 21, 2010 permanently enjoining Tillman from acting as a bankruptcy petition preparer. The UST also noted

-4-

that the Consent Judgment imposed monetary sanctions against Tillman, but he had not complied with them. The UST told the Court that the situation that Hutchinson described was something that the UST's office had been investigating for the last several months. The UST explained that Hutchinson is one of a number of debtors who initially filed a Local Declaration stating that they had no help in filing their bankruptcy case, only to later come clean and admit to the UST that they did have help in filing their bankruptcy petition, and that they were coached to hide that fact from the Bankruptcy Court. The UST further elaborated that its investigation showed that Tillman had set up a business enterprise with Sullivan and others to enable Tillman to surreptitiously continue to perform bankruptcy petition preparer services in violation of the Consent Judgment. The UST stated that it is continuing to investigate other cases with a similar fact pattern and beginning to file additional pleadings seeking relief against Tillman, Sullivan and others in connection with what the UST described as Tillman's bankruptcy petition preparer business. Finally, the UST declared that it planned to take further action against Tillman and Sullivan in the Hutchinson case.

Based on the statements made at the show cause hearing by Hutchinson, Sullivan and the UST, the Court authorized the UST to conduct discovery and granted the UST's request for additional time in which to file an action against Sullivan, Tillman and any others who may be involved with them in a bankruptcy petition preparer business. Expressing its concern over the information it learned at the show cause hearing, the Court also strongly encouraged Sullivan to obtain counsel to address the UST's allegations against him. The Court then scheduled an evidentiary hearing for June 27, 2012 to more fully develop the record before determining whether to take any further action and, if so, what action to take.

On June 7, 2012, the UST filed a motion in Hutchinson's case (ECF No. 29). The motion requested the Court to assess fines and sanctions against Tillman, Sullivan and two other individuals, Kenneth Scales (a/k/a Kenneth Simmons) and Aleia Renfro. The motion alleged that all four of these individuals were acting in concert to provide bankruptcy petition preparer services and counseling, violating both the Consent Judgment and § 110 of the Bankruptcy Code, encouraging Hutchinson to conceal their involvement, and charging a fee far in excess of the value of their services. Sullivan, now represented by counsel, filed a response to the UST's motion. Scales filed a response to the UST's motion, but Tillman and Renfro did not. In the meanwhile, after the show cause hearing, the UST also filed motions in two other cases assigned to this bankruptcy judge, seeking similar relief against the Respondents: Angela Denise Walker, case no. 11-69551, and Dominic Moorer, case no. 12-41368. The Court scheduled those motions for hearing on June 27, 2012 at the same time as the evidentiary hearing in the Hutchinson case.

At the June 27, 2012 evidentiary hearing, the UST requested an adjournment for the purpose of consolidating the evidentiary hearing in Hutchinson's case with hearings regarding the similar relief that the UST was now requesting against the Respondents in the Walker and Moorer cases. The UST further explained that on June 8, 2012, the UST had also filed a motion requesting the Court to enter an order consolidating the proceedings on the UST's motions against the Respondents in a number of other cases as well because there were common issues of law and fact in such cases, and because consolidation of all of the proceedings brought by the UST against the Respondents would avoid unnecessary cost and delay both for the UST and for the Respondents.

Based upon the UST's representations on the record on June 27, 2012, the Court granted the adjournment. To further streamline the proceedings, the Court entered an order setting forth a

-6-

calendar, specifying that if the UST planned to file any additional requests for relief against any of the Respondents to be heard on a consolidated basis with the proceedings in the Hutchinson case, the UST must do so by July 9, 2012. The Court then crafted a calendar for discovery for all parties to the UST's motions, and set a deadline for completion of all discovery by September 30, 2012. The Court adjourned the evidentiary hearing to October 17, 2012, and indicated in its order that it would conduct one hearing at that time that would serve as the record for all of the cases in which the UST's motions were to be heard on a consolidated basis. Both Tillman and Sullivan were present at the June 27, 2012 hearing and consented to have all of the UST's motions heard together on a consolidated basis according to the calendar set forth by the Court. Scales and Renfro were not in attendance, and took no position regarding either the consolidation of the proceedings or the calendar crafted by the Court.

On July 6, 2012, the Court entered an order in the Hutchinson case (ECF No. 44) that consolidated the UST's motions for relief against the Respondents in seven cases together with the Hutchinson case.[2] On September 6, 2012, the Court entered a second order in the Hutchinson case (ECF No. 45) adding three more cases in which the UST had also filed similar motions against the Respondents.[3] On October 4, 2012, an order was entered by another bankruptcy judge in this district adding one more case in which the UST had filed a similar motion against the Respondents.[4]

---

[2] Angela Denise Walker, case no. 11-69551; Marvin Wiseman, case no. 11-69553; Brian L. Moore, Jr., case no. 11-70573; Lamont Lashawn Walker, case no. 12-40117; Dominic Moorer, case no. 12-41368; Camille Leana Gray, case no. 12-44685; and Robert A. Owens, case no. 12-44762.

[3] Devin Deshawn Wilkerson, case no. 12-40279; Anthony Dwayne Goodson, case no. 12-44116; and Cathleen C. Lickner, case no. 12-44504.

[4] Ebonye S. Strong, case no. 12-43420.

Finally, also on October 4, 2012, the Court added one more case in which the UST had filed a similar motion against the Respondents.[5]  None of the Respondents objected at any time to the UST's requests to have the hearings on the UST's motions in such cases consolidated so that they could be heard as part of the adjourned evidentiary hearing scheduled in the Hutchinson case for October 17, 2012.

On October 17, 2012, the Court held a consolidated evidentiary hearing on the UST's motions for sanctions and other relief against the Respondents in the following 13 separate bankruptcy cases ("Consolidated Cases"):[6]

(1)     Alexandria Hutchinson, case no. 12-44688-PJS;
(2)     Anthony Dwayne Goodson, case no. 12-44116-TJT;
(3)     Camille Leana Gray, case no. 12-44685-WSD;
(4)     Derrick Hopkins, case no. 12-46844-PJS;
(5)     Cathleen C. Lickner, case no. 12-44504-TJT;
(6)     Brian L. Moore, Jr., case no. 11-70573-WSD;
(7)     Dominic Moorer, case no. 12-41368-PJS;
(8)     Robert A. Owens, case no. 12-44762-WSD;
(9)     Ebonye S. Strong, case no. 12-43420-MBM;
(10)    Angela Denise Walker, case no. 11-69551-PJS;
(11)    Lamont Lashawn Walker, case no. 12-40117-WSD;
(12)    Devin Deshawn Wilkerson, case no. 12-40279-TJT; and
(13)    Marvin Wiseman, case no. 11-69553-WSD.

The relief requested by the UST against the Respondents in some of the Consolidated Cases varies from the relief sought in the others.  In eight of the Consolidated Cases, the UST seeks relief

---

[5] Derrick Hopkins, case no. 12-46844.

[6] Some of the Consolidated Cases were assigned to this bankruptcy judge, but others were assigned to Bankruptcy Judge Thomas J. Tucker, Bankruptcy Judge Walter Shapero, and Bankruptcy Judge Marci B. McIvor.  All four of these bankruptcy judges agreed to have this bankruptcy judge conduct the evidentiary hearing on the UST's motions in the Consolidated Cases, with all other proceedings in such cases remaining with the bankruptcy judge to whom such cases were originally assigned.

-8-

under § 110 against all four Respondents. However, in the other five [7] Consolidated Cases, the UST points out that it has already obtained orders granting sanctions against Tillman in those cases. Therefore, the UST is only asking for relief against Tillman in those five cases based upon violations of the orders previously entered in such cases. Sullivan, Scales and Renfro each filed a response in some of the Consolidated Cases, denying that they acted as a bankruptcy petition preparer for the debtors in those cases. Tillman did not file a response to any of the UST's motions in the Consolidated Cases.

At the evidentiary hearing on October 17, 2012, the UST called 11 witnesses. The UST also informed the Court that the UST had subpoenaed two other individuals that the UST planned to call as witnesses, but they had failed to appear at the hearing. As a result, at the conclusion of the hearing that day, the UST asked the Court to keep the evidentiary record open to permit the UST to procure the attendance of those two individuals so that they could testify at another time and have their testimony become part of the record in the Consolidated Cases. The Court granted that request. The Court then continued the evidentiary hearing to November 15, 2012. The two witnesses who failed to attend the October 17, 2012 hearing both appeared on November 15, 2012 and testified. In addition to receiving testimony from the 13 witnesses, the Court also received into evidence exhibits 1 through 20.

Tillman and Sullivan each attended both days of the evidentiary hearing. Both of them were represented by counsel throughout the hearing. Renfro attended both days of the hearing, and represented herself. Scales failed to appear on the first day of the hearing, attended only the second

_____

[7] Those five cases are: Brian L. Moore, case no. 11-70573; Dominic Moorer, case no. 12-41368; Angela Denise Walker, case no. 11-69551; Lamont Lashawn Walker, case no. 12-40117; and Devin Deshawn Wilkerson, case no. 12-40279.

day of the hearing, and represented himself. None of the Respondents introduced any evidence of their own at the hearing. At the conclusion of the second day of the hearing, the Court advised each of the Respondents that they could file a post-hearing memorandum if they wished to do so. The Court gave them 10 days to do so. None of the Respondents filed a post-hearing memorandum.

The Court has now had the opportunity to review the extensive evidentiary record made at the hearing. The UST's requests for relief against the Respondents in the Consolidated Cases are now ready for decision.

## **The Evidentiary Hearing**

### The debtors' testimony

The UST called nine different debtors to testify about their own bankruptcy cases, the help that they had in filing those cases, and the experiences that they had with the Respondents. Four of these witnesses are debtors in the Consolidated Cases, and the other five are debtors in other bankruptcy cases. The four debtor witnesses who are debtors in the Consolidated Cases are Alexandria Hutchinson, Camille Gray, Ebonye Strong and Derrick Hopkins. Although much of the debtors' testimony is duplicative, the full scope and extent of the Respondents' activities is best understood by reviewing the testimony of all of the debtors. Their testimony is summarized as follows.

Hutchinson was the first debtor to testify. Hutchinson's contact with the Respondents began when she found an advertising card in her neighborhood that offered assistance for "driver's license repair" and "credit repair" (Exhibit 5). Hutchinson was interested in the information on the card because she had previously lost her driver's license and she was "already looking around" to get "help" with her license. (Tr. 17:17-19, Oct. 17, 2012, ECF No. 92.) So Hutchinson called one of

the telephone numbers on the card. Hutchinson spoke with someone by the name of "Kenny." (<u>Id.</u> at 18:5-11.) Although Hutchinson was interested in getting information over the telephone about how to clear up her tickets, Kenny asked her to come in for an appointment. There was no mention of bankruptcy during that telephone call. Hutchinson set up an appointment as Kenny requested.

Hutchinson went to the appointment at an office building at Twelve Mile and Van Dyke. When she arrived, Kenny met her at the door and introduced himself. Kenny provided Hutchinson with an "intake form" to obtain some information from her. (<u>Id.</u> at 19:12-13.) The intake form asked questions about what debts Hutchinson had accumulated, whether she had a job, and other personal information. Then Hutchinson met with Sullivan. As Sullivan went over the intake form with Hutchinson, Hutchinson had many questions about how Sullivan could clear up all of her tickets and driver responsibility fees. During this first meeting, there was still no mention of bankruptcy. Although Hutchinson did not pay any money to Sullivan or Kenny at this meeting, Sullivan let her know that the "services" were going to cost her $575.00, but "if [she] referred a friend, [she] would get a discount." (<u>Id.</u> at 20:24, 21:10.) Hutchinson testified that she later referred her cousin, Camille Gray.

Hutchinson then went back for a second visit, this time accompanied by Gray. Again, she met with Sullivan and Kenny. This time, they spoke to her about being "eligible" to file bankruptcy, and about how bankruptcy could clear up her tickets, driver responsibility fees and other debts that she had accumulated over the years. (<u>Id.</u> at 21:25.) Hutchinson paid $500.00 to Sullivan and Kenny at this meeting. She also paid some additional fees for "tests." (<u>Id.</u> at 22:10.) At this meeting, Hutchinson was told that she would have to come back to "pick up the bankruptcy papers," (<u>id.</u> at 22:12), and that she would be called when her bankruptcy papers were ready.

-11-

Sometime after that meeting, Hutchinson received a telephone call from someone by the name of Aleia. When Aleia called, she told Hutchinson that she had prepared Hutchinson's papers and that they were ready to be picked up. Hutchinson did not pick up the papers herself, but instead had her cousin, Gray, pick them up. Hutchinson testified that Gray picked them up from Sullivan and then brought them to Hutchinson.

Hutchinson then went back to the office for a third time. This time she met with Sullivan, who provided her with instructions on how to file the papers with the Bankruptcy Court, and gave her instructions about yet another meeting that she would have to attend with Tillman. Although Hutchinson signed the papers at her meeting with Sullivan, she went back for a fourth and final meeting, this time with Tillman. When she arrived for this meeting, Tillman gave her "a small packet with step-by-step instructions on how to go over my bankruptcy and rehearse everything for Bankruptcy Court." (Id. at 23:15-19.) Hutchinson explained her understanding that she needed to "rehearse" so that she would "be prepared" to tell the Bankruptcy Court that she did not "get any help" and that she would not "give any names" about who was helping her. (Id. at 23:20-25.)

Hutchinson identified Sullivan and Tillman in the courtroom. However, at the time that she testified, Kenny was not in the courtroom. Hutchinson testified that she had not previously met Aleia, but had only spoken to her over the telephone. Although Hutchinson testified that she did not actually see any individual preparing her bankruptcy papers, Hutchinson testified that Tillman, Sullivan and Aleia all told her that Aleia was the individual who actually had prepared Hutchinson's bankruptcy papers. Hutchinson also explained that while she took the budget and credit counseling test herself, as part of her agreement with the Respondents, someone else took a second test for her.

Although the record is silent as to the dates of the meetings and telephone calls that Hutchinson had with the Respondents, Hutchinson signed a contract (Exhibit 1) with S&T Enterprise ("S&T") dated February 18, 2012. The contract is also signed by Sullivan. There is a handwritten notation on the contract that says "paid in full $500.00." The contract states that S&T "is NOT a law firm," and its "consultants are NOT attorneys." The contract further explains that by signing the contract, Hutchinson is "seeking the help of S&T for consulting purposes only."

Camille Gray testified next.[8] Gray testified that she had an experience very similar to Hutchinson's experience. Like Hutchinson, Gray was interested in getting help to clear up her tickets and deal with her driver responsibility fees. Gray stated that she did not have any intention of filing bankruptcy.

Like Hutchinson, Gray met with Kenny, Sullivan and Tillman, but only spoke to Aleia over the telephone. After meeting with Sullivan and Tillman, Gray received a telephone call from Aleia informing her that her paperwork was ready to be picked up. Gray described the entire sequence of events as a "chain process," and identified the roles of each of the Respondents in this process. (Tr. 40:8, 45:23, Oct. 17, 2012, ECF No. 92.) Gray testified that Sullivan informed her that she would be filing bankruptcy, but he did not tell her this until "later on into the process." (Id. at 40:14, 45:1-4.) Sullivan also took Gray's money. Kenny took her "intake papers" and took an online test for her, at a cost of $35.00 or $40.00. (Id. at 46:1.) Gray testified that Aleia prepared her

---

[8] On February 29, 2012, Gray filed bankruptcy case no. 12-44685 pro se. On the same day, she filed a Local Declaration stating that she did not have any help in preparing the documents for her bankruptcy filing, and stating that she did not pay anyone for help in connection with the bankruptcy filing. On April 9, 2012, Gray filed an amended Local Declaration (ECF No. 16), stating that she did have help in preparing the documents, and paid $500.00 for that help.

bankruptcy papers, but Tillman gave her the bankruptcy papers, explained them to her, and went over the different sections to familiarize her with them. Gray also testified that Tillman gave her a "cheat sheet" to let her know what sections of the papers to study, what questions might be asked, and how she should answer those questions. (Id. at 43:22-24.) Gray identified copies of two documents (Exhibits 2 and 3). The first one (Exhibit 2) expressly instructs an individual filing bankruptcy as follows:

> You DID NOT have help with the paperwork! They will try and ask you many different ways! Don't let them confuse you! If you say you had help, they will make you pay the 299.00 fee, and dismiss your case! So no, you had NO help!

Gray identified the second document (Exhibit 3) as the "cheat sheet that Mr. Tillman gave us." (Tr. 48:5-6, Oct. 17, 2012, ECF No. 92.) It contains instructions regarding "Research for chapter 7," a section entitled "Bankruptcy Documents in order as listed," another section entitled "Schedule from A-J," and other sections regarding a statement of financial affairs, statement of intention, statement of social security number, a B-22A Chapter 7 statement of current monthly income and means test calculation, and certification of completion of instructional course on personal financial management.

Gray's meeting with Tillman was "at the end" of the process, and Tillman explained to her what she should do after the bankruptcy case was filed. (Id. at 46:8-10.) According to Gray, Tillman explained that once the bankruptcy case is filed, "the judge that you get is a pain in the rear end." (Id. at 47:1-2.) Gray testified that Tillman explained to her that there would be lots of questions asked to her after she filed her bankruptcy, so it was important that she tell the Court that she did not have any help in preparing her bankruptcy, because otherwise she would "get in trouble." (Id. at 46:18.)

The third debtor in the Consolidated Cases to testify was Ebonye Strong.[9] Strong explained that she too had help filing her bankruptcy case. Strong learned about Sullivan through a friend, Michael Vincent, who took her to meet Sullivan at an office. At the meeting, Strong and Sullivan discussed bankruptcy. Sullivan told her that the entire process would cost about $600.00. Strong put $100.00 down, and Sullivan told her that he could proceed once she brought back the balance. During that visit, Strong met only with Sullivan.

Strong did not go back to visit Sullivan until her check was garnished some time in February, 2012. When that happened, she called Sullivan to set up a meeting. At the meeting, Strong and Sullivan discussed bankruptcy again, and Strong paid Sullivan $570.00. Sullivan wrote out a receipt, and told Strong that "a young lady" would be in contact with her about her paperwork once it was done. (Id. at 52:23.) Just as Sullivan promised, a "young lady" did call Strong to discuss Strong's paperwork. (Id. at 53:16-18.) After the call, Strong went back to the office to pick up her paperwork. At this third visit to the office, Strong met with someone who told her that his name was "Rico." (Id. at 54:7.) Strong pointed out Tillman in the courtroom as the person who said his name was Rico. Strong explained that Tillman went over her paperwork with her. Strong also testified that Tillman warned her that her trustee, Charles Taunt, was a "jerk, and he was going to try to do everything possible to get me to say that I had help, don't tell him I have help, otherwise, you know, I could get in trouble." (Id. at 54:23-25, 55:1.)

---

[9] On February 16, 2012, Strong filed bankruptcy case no. 12-43420 pro se. On the same day, she filed a Local Declaration stating that she did not have any help in preparing the documents for her bankruptcy filing, and stating that she did not pay anyone for help in connection with the bankruptcy filing.

Unlike Hutchinson and Gray, Strong did not testify that she ever met or spoke with Kenny, nor was she able to identify the name of the young lady that spoke to her about her paperwork. Also, like Hutchinson and Gray, Strong testified that she did not actually witness an individual filling out her paperwork for her.

Derrick Hopkins was the last debtor in the Consolidated Cases to testify.[10] Hopkins testified that he filed his bankruptcy case without an attorney, but that he had help. Hopkins came about getting that help when he saw a "flyer" in his neighborhood a number of times at gas stations located on Eight Mile. (Id. at 84:8-10.) The flyer referred to license repair and credit repair. Hopkins identified Exhibit 5 as the flyer. Hopkins called one of the telephone numbers on the flyer to ask questions about license repair and bills that he had. Hopkins spoke to someone by the name of "Shamar." (Id. at 86:20.) Shamar did not answer his questions over the telephone, but told him to come in and set up an appointment. Shamar also quoted a price between $600.00 and $1,000.00 "depending on the debts that I have." (Id. at 87:18-19.) There was no discussion of bankruptcy in this initial telephone call. Hopkins then set up a date for the meeting.

Hopkins went to a meeting at an office on Twelve Mile and Van Dyke. He met with Sullivan. Hopkins spoke to him about his license, his credit, child support, debts and other matters. Sullivan had Hopkins fill out a paper with lots of information. Bankruptcy still was not discussed, but Sullivan did tell Hopkins that his services would cost $600.00.

---

[10] On February 29, 2012, Hopkins filed bankruptcy case no. 12-46844 pro se. On the same day, he filed a Local Declaration stating that he did not have any help in preparing the documents for his bankruptcy filing, and stating that he did not pay anyone for help in connection with the bankruptcy filing.

-16-

Hopkins went back for a second meeting. This time, he brought money and paid it to Sullivan. At this point, Sullivan was still the only person that Hopkins had met with, but then there was a third meeting where Hopkins met somebody named Rico. (Id. at 90:8-9.) Like the other witnesses, Hopkins pointed out Tillman in the courtroom as being Rico. During this third meeting, Tillman gave Hopkins some papers, but also told him to come back for the "bankruptcy paperwork." (Id. at 90:25.) Tillman did not give Hopkins a specific date to come back, but after that meeting Hopkins received a telephone call from Aleia. Aleia told Hopkins that she was a paralegal. Although his testimony was not entirely clear, Hopkins came back to the office again, met with Tillman, and received his bankruptcy paperwork from Tillman already filled out. Hopkins did not see the paperwork actually being prepared.

In the several meetings that Hopkins had at the office on Twelve Mile and Van Dyke, Hopkins met only with Sullivan and Tillman. Although he spoke to Aleia over the telephone, he never met her in person. Hopkins did not mention Scales in his testimony.

The next five debtor witnesses are not debtors in the Consolidated Cases, but are debtors in other bankruptcy cases. The first witness to testify from this group of debtor witnesses was Deirdre Potts.[11] Potts testified that she filed her bankruptcy case without an attorney, but that she had help. Like some of the other debtors who testified, Potts had trouble with "tickets and stuff." (Id. at 59:12-13.) Potts's cousin gave her a number to call to get some help. Potts called the number and it was answered by a person who identified himself as Rico. Potts explained in the telephone call

---

[11] On February 27, 2012, Potts filed bankruptcy case no. 12-44397 pro se. On the same day, she filed a Local Declaration stating that she did not have any help in preparing the documents for her bankruptcy filing, and stating that she did not pay anyone for help in connection with the bankruptcy filing.

that she had some tickets and some bills that needed to be paid and wondered whether Rico could help her. Rico told Potts to come in for a meeting and told her what to bring. There was no mention of bankruptcy in the telephone call. Potts agreed to the meeting, thinking it was just for the purpose of helping her clear up her tickets and other bills.

When Potts came to the meeting, she was met by Sullivan. Potts recalled that the office was at Twelve Mile and Van Dyke. She discussed her bills and other problems with Sullivan, who said he could help her for a fee of $550.00. Sullivan did not mention that the help would involve filing a bankruptcy. Potts put down $250.00 at that meeting.

Potts came to another meeting with Rico. Potts pointed out Tillman in the courtroom as Rico. Tillman spoke with her at this meeting about her "paperwork." (Id. at 62:3.) Although the timing is not entirely clear from Potts's testimony, she testified that she did not learn that she was filing a bankruptcy until she "put down [her] last payment." (Id. at 61:21-22.)

Like Strong, Potts also recalled that Tillman explained to her that the "guy" at her first court appearance was a "jerk," and that she "should go in with her own paperwork," but "don't take other paper[s]" that were given to her by Sullivan or Tillman. (Id. at 62:14-16.) Potts also testified that Scales introduced himself to her as "Ken" when she was at the office, and that he said that he was available in case she had questions while she took an online course on a computer provided to her by Sullivan and Tillman at the office. (Id. at 63:3-4.) Like the other witnesses, Potts testified that her bankruptcy papers were already prepared when she picked them up, and she did not actually witness someone filling them out. Potts testified that she met with Sullivan and Tillman, and had contact with Scales, but did not mention Aleia during her testimony.

-18-

Janetta Grant was the second debtor in this group to testify.[12]  Grant testified that she filed her bankruptcy case without an attorney, but that she had help.  Unlike some of the other debtors, Grant testified that she needed to file bankruptcy and was looking for help to do so because she was being garnished at that time.  One of her co-workers provided a telephone number to her, so she called it.  Sullivan answered the call.  Sullivan told Grant to come in for a meeting.

Grant met Sullivan at an office at Twelve Mile and Van Dyke.  Sullivan spoke to Grant at the meeting about helping her file bankruptcy and helping to get rid of her garnishment.  Sullivan told Grant that it would cost her $650.00.  Grant made "a payment plan" with Sullivan.  (Id. at 68:20.)  She recalled giving the first payment of $200.00 to Sullivan himself, but could not recall who she left the balance of the payments with.  Grant testified that she was given a receipt (Exhibit 1 at 2) dated December 22, 2011, which contained her signature and some handwritten notes showing the payments that she had made.

After Grant made the final installment payment, she met with someone who identified himself as Rico.  Grant pointed out Tillman in the courtroom as Rico.  Tillman told her that bankruptcy paperwork was being prepared for her and that someone would call her to let her know when the papers were done.  True to form, someone did call.  Upon receiving the call, Grant went back to the office to get her paperwork.  Tillman sat down to go over it with her.  Grant testified that Tillman gave her a sheet directing her as to "exactly what to say" in the bankruptcy case.  (Id. at 70:14-15.)

---

[12] On January 23, 2012, Grant filed bankruptcy case no. 12-41369 pro se.  On the same day, she filed a Local Declaration that she did not have any help in preparing the documents for her bankruptcy filing, and stating that she did not pay anyone to help her in connection with the bankruptcy filing.

Altogether, Grant recalled going to the office about four or five times, meeting with Sullivan and Tillman. Grant did not mention Scales in her testimony at all. When asked directly about Aleia, Grant stated that she had never met with her or spoken to her.

Ibn-Jabari Anthony Ali was the third debtor in this group to testify.[13] Ali testified that he filed his bankruptcy case without an attorney, but that he had help. Ali testified that he knew Sullivan "from around the neighborhood," and Sullivan gave him a "flyer" (Exhibit 5) with a telephone number on it. (Tr. 75:3, Oct. 17, 2012, ECF No. 92.) When Sullivan gave the flyer to Ali, Sullivan told Ali that he could "get everything swiped up." (Id. at 76:7-8.) Sullivan went on to tell Ali to "pay him some money and he'd get everything--he'd do my paperwork for me and get everything ready when I can go to court." (Id. at 76:14-17.) Sullivan told Ali that it would cost "a total of $615.00." (Id. at 76:18-20.)

About a week later, Ali called Sullivan again, set up an appointment, and went to the office at Twelve Mile and Van Dyke. Ali met with Sullivan. Ali testified that he gave Sullivan $575.00 at that meeting, and then they talked about the paperwork that needed to be prepared. Sullivan told Ali to go online and take a course, and then Ali left.

About a week later, Ali called back. He explained that his reason for calling back was that no one had called him to tell him that his paperwork was ready. So he called Sullivan and asked him about it. Sullivan told Ali that he needed to call a woman about the paperwork but, after that, Ali could come in and pick it up. Ali did so. At this meeting, his second visit to the office, Ali "met a

---

[13] On March 8, 2012, Ali filed bankruptcy case no. 12-45683 pro se. On the same day, he filed a Local Declaration stating that he did not have any help in preparing the documents for his bankruptcy filing, and stating that he did not pay anyone for help in connection with the bankruptcy filing.

guy named Rico." (Id. at 79:8.) Like the other witnesses, Ali pointed out Tillman in the courtroom as the individual who identified himself as Rico. On his third visit to the office, Ali explained that he "met with Rico" and Rico told him "what to say and what not to do" in his bankruptcy case, but the "two main things he kept stressing and saying make sure I say I have not had--didn't have no help," and that his case would be dismissed if he admitted he did have help. (Id. at 79:20-25, 81:9-11.) Ali said that Sullivan told him "the same thing." (Id. at 81:13.)

Like all of the other debtors who testified, Ali did not actually see any of the Respondents fill out his paperwork. Ali did not mention either Scales or Aleia in his testimony, and described his meetings as taking place solely with Sullivan and Tillman.

The last debtor in this group to testify on the first day of the hearing was Timika Gibbons.[14] Gibbons testified that she filed her bankruptcy case without an attorney, but that she had help. Gibbons explained that her boyfriend's cousin "had seen [the] flyer in a car lot" that had information on it about driver's license repair and credit repair. (Id. at 96:16-17.) Gibbons was interested because her driver's license was suspended, and she owed some driver responsibility fees. So Gibbons called one of the numbers on the flyer. Gibbons spoke with someone named "Mr. Braxton." (Id. at 97:8-9.) Braxton made an appointment for Gibbons to come in to an office located at Twelve Mile and Ryan.

Gibbons went to the appointment. Gibbons met with Braxton, who said that he would need $575.00 before he could go any further. Gibbons paid $575.00 to Braxton and received from him

---

[14] On September 13, 2012, Gibbons filed bankruptcy case no. 12-60800 pro se. On the same day, she filed a Local Declaration stating that she did not have any help in preparing the documents for her bankruptcy filing, and stating that she did not pay anyone for help in connection with the bankruptcy filing.

a receipt that she said looked like the receipts that make up Exhibit 1. Gibbons did not meet with anyone else during this first visit. Gibbons testified that she saw Braxton in court on the day that she testified, but he was not in the courtroom during her testimony, so she could not point him out.

Gibbons explained that she went back for a second meeting. This time, she met with someone who she thought was named Lisa. However, while she was on the stand, Gibbons identified Aleia Renfro as the person that she thought was Lisa. At this second meeting, Aleia gave Gibbons a package with bankruptcy paperwork in it, and went over it with her. It was at this meeting that Gibbons realized that she was filing bankruptcy. Gibbons signed the papers. Aleia instructed Gibbons to file the paperwork at the Bankruptcy Court.

Gibbons was instructed to come back to the office ten days before her court date, but she did not do so. When she did go back to the office, it was just a day before her court date, and Braxton told her that he could not do anything for her at that meeting.

Unlike most of the other witnesses, Gibbons never met or spoke with Sullivan or Tillman. Further, Gibbons did not mention Scales in her testimony. Also, again unlike most of the other witnesses, Gibbons testified that she did meet face to face with Aleia. One other difference in her testimony is that the office that she described was not at Twelve Mile and Van Dyke, but instead was at Twelve Mile and Ryan.

On the second day of the hearing, the UST called one more debtor witness who is not a debtor in the Consolidated Cases, Shalanda Keaton. Keaton filed her own bankruptcy case pro se on August 6, 2012.[15] Keaton testified that she paid $500.00 to Jennifer Washington to help her.

---

[15] On August 6, 2012, Keaton filed bankruptcy case no. 12-58112 pro se. On the same day, she filed a Local Declaration stating that she did not have any help in preparing the documents for her bankruptcy filing, and stating that she did not pay anyone for help in

-22-

Keaton described Washington as a former co-worker that she bumped into at a grocery store. Keaton testified that she did not know any of the Respondents, and did not have any contact with them. According to Keaton, the only help she had was from Washington.

Keaton admitted that her testimony at the evidentiary hearing was different than the testimony she previously provided both at her § 341 meeting and at a deposition taken by the UST on October 10, 2012. At her deposition, Keaton testified that she had found a flyer that looked like Exhibit 5 at a liquor store in Southfield and that she called the number, which was the same number as on Exhibit 5, and spoke to someone named Braxton. Also, during her deposition, Keaton testified that she set up a meeting with Braxton and went to the office at Twelve Mile and Ryan to meet with Braxton. Aside from the fact that the person she met with was named Braxton, the rest of Keaton's deposition testimony described a process of obtaining assistance to file bankruptcy much like the process described by the eight debtors who testified at the evidentiary hearing on October 17, 2012. Keaton even testified in her deposition that she signed a contract that looked like the contract that is marked as Exhibit 1 at the evidentiary hearing. During her deposition, Keaton testified to three separate meetings at the office at Twelve Mile and Ryan, and described the meetings as very similar to the meetings described by the other eight debtors who testified.

At the evidentiary hearing, Keaton did a complete about face. Keaton testified that she was not telling the truth either at her deposition or at her § 341 meeting. Keaton disavowed all of her deposition testimony about meeting with Braxton at Twelve Mile and Ryan and about the other meetings she described that she attended at that office. Keaton claimed that she testified falsely during her deposition because she felt "threatened" by the UST. (Tr. 28:22-25, Nov. 15, 2012, ECF

connection with the bankruptcy filing.

No. 93.) Keaton now testified that the only person who helped her with her bankruptcy case was Washington, and that she never went to the office at Twelve Mile and Ryan, and never met with an individual by the name of Braxton. She also disavowed her prior testimony that she had signed a contract like the contracts that make up Exhibit 1. Instead, she now testified that the only help she had was from Washington, and she paid Washington $500.00.

Keaton was a belligerent witness. Her tone was defiant, and her answers were not credible. While her deposition testimony tends to corroborate the UST's allegations about the bankruptcy assistance business operated by S&T and the Respondents, her evidentiary hearing testimony does not. After observing Keaton's demeanor during her testimony, the Court is left with the impression that her testimony at the evidentiary hearing is not truthful and cannot be relied upon.

<u>The Respondents' testimony</u>

In addition to calling nine debtors to testify about their experiences in filing their bankruptcy cases pro se, and in obtaining assistance in various forms from the Respondents, the UST called three of the Respondents, Tillman, Renfro, and Scales to testify. The UST did not call Sullivan as a witness, nor did Sullivan testify on his own behalf.

The first Respondent to testify was Tillman. In a word, Tillman agreed with virtually all of the allegations made by the UST. Other than Keaton, Tillman's testimony was consistent with the testimony of all of the debtors called to the stand by the UST. Tillman's testimony painted a picture of an extensive business enterprise operated by the Respondents for the purpose of charging fees to help individuals file pro se bankruptcy cases.

Tillman began by testifying that he owned a company by the name of Hatz Management that provided supplies to the casinos in Detroit. Hatz operated out of an office located at Twelve Mile

-24-

and Van Dyke. Tillman testified that his business was not doing well, and he needed some additional work. Although the date is unclear, Tillman testified that Sullivan approached him at some point and asked him to be a part of a business that Sullivan was involved in. Sullivan described the business as repairing problems with individuals' driver's licenses. Tillman took Sullivan up on his offer. He soon learned that individuals "can get their license back by filing bankruptcy." (Tr. 124:11-3, Oct. 17, 2012, ECF No. 92.) In 2009, Sullivan and Tillman formed a business that they called "S&T Enterprise." (Id. at 122:14-15, 19:22.) "S" stood for Sullivan, "T" for Tillman. (Id. at 123:17-18, 19-20.) S&T operated out of rented space at the office at Twelve Mile and Van Dyke.

According to Tillman, S&T initially obtained its customers by "word of mouth" referrals. (Id. at 125:12.) Eventually, S&T began to advertise. Tillman described a flyer (Exhibit 5) used by S&T to advertise its services. Beginning in 2010, Scales joined S&T and began passing out flyers at "gas stations, liquor stores" and other places. (Tr. 126:20-21, Oct. 17, 2012, ECF No. 92.) Tillman stated that Scales' connection with S&T began when "he was a client" who filed his own bankruptcy case with assistance from S&T. (Id. at 126:24-25.) Tillman described Scales' responsibilities with S&T as primarily handing out flyers and marketing: "Pretty much make flyers and go out and get clients." (Id. at 132:14-15.) The two telephone numbers on the flyer rang either at Scales' office or at his cell phone. When a prospective customer saw the flyer and called one of the telephone numbers, Scales would answer. Scales would then set up an appointment for the customer to come into the office at Twelve Mile and Van Dyke.

Scales was the first person at S&T that a potential customer spoke to. Sullivan was the next. Tillman described a process whereupon receiving a telephone call, Scales would set up an

appointment for the customer, who would then meet at the office at Twelve Mile and Van Dyke with Sullivan. When the customer came in for the first meeting with Sullivan, Sullivan would discuss with the customer license repair and credit repair. Tillman admitted that driver's license repair always meant filing bankruptcy. Sullivan was always present at these initial meetings, although sometimes Tillman participated as well. At these initial meetings, prospective customers of S&T were given a contract (Exhibit 1). The contract emphasized that S&T was "NOT a law firm." The entire contract reads as follows:

Contract:

I, _____, fully and completely understand that S&T Enterprise is NOT a law firm, and its consultants are NOT attorneys. The employees of S&T Enterprise cannot represent me in any court proceeding. I am seeking the help of S&T for consulting purposes only. I do understand that all monies exchanged are NOT REFUNDABLE, and that I am to complete any task given to me by any representative of S&T. I also understand that any information exchanged in any meeting with S&T and its associates is completely confidential between both parties.

I agree to the information stated above and am a willing to participate in the steps given to me in order to be successful.

Signed this day _____ 20____

Client: _____

The services provided by S&T were not described in the contract, but S&T told the prospective customer how much the services would cost, and handwritten notes were made on each contract to indicate the date and amount of payments made by the customers. Tillman explained that S&T generally charged between $500.00 and $600.00 for its services. (Tr. 137: 21-23, Oct. 17, 2012, ECF No. 92.) The specific amount in each case was determined by Sullivan. Out of the entire price paid by the customer, Tillman testified that Sullivan kept $150.00, Tillman received between $125.00 and $150.00, Scales received $100.00, and Renfro received between $75.00 and $100.00.

-26-

(Id. at 176: 5-11.)  Customers paid either Sullivan or Tillman, although Tillman also recalled that some payments were collected by either Scales or Renfro.  According to Tillman, by the time the customer signed the contract and paid the money, they knew they were filing a bankruptcy case.  (Id. at 138:11-14.)

Although Tillman initially was involved only in getting clients and marketing for S&T, his role in the business soon evolved.  Tillman took on the responsibility of making sure that customers got their paperwork so they could file their bankruptcy cases.  At the initial meeting, the customer was given an "intake form" to fill out containing information regarding the customer's income, debts and other personal information.  (Id. at 139:9-12.)  When the customer left the initial meeting with Sullivan or Tillman, the customer would hand them the filled out intake form, along with the signed contract.  After that meeting, S&T would pull a credit report.  The credit report and the completed intake form were then "placed in a bin" either by Sullivan or Tillman.  (Id. at 139:21-24.)  The bin was located in Tillman's office.

Here is where another one of the Respondents came into the process.  Tillman testified that approximately once a week, Renfro would come by the office and pick up the completed intake forms and credit reports in the bin.  According to Tillman, Renfro first became involved with S&T in 2009 after answering an ad on Craigslist placed by S&T to hire an assistant.  At first, Renfro's job was much like Scales' and Tillman's initial job: getting customers and marketing.  However, because Renfro stated that she was a paralegal, she soon moved into preparing bankruptcy papers for customers based upon the information included in the completed intake forms that were left in the bin.  Initially, Renfro prepared the bankruptcy papers right at the office at Twelve Mile and Van Dyke.  Before long, she was preparing them offsite.  According to Tillman, Renfro was the only

-27-

person associated with S&T who prepared the bankruptcy papers. (<u>Id.</u> at 142:19-21.) Each time that Renfro picked up the completed intake forms in the bin, she would drop off the bankruptcy papers that she had prepared for other customers. Tillman estimated that, in any given week, Renfro prepared between "five to eight" bankruptcy cases based upon the completed intake forms that she picked up from the bin. (<u>Id.</u> at 144:11-15.)

After Renfro returned the prepared bankruptcy documents for a particular customer, Tillman, Sullivan or Renfro would call the customer to have them set up an appointment to sign and pick up their bankruptcy papers. When the customer came to this meeting, they would ordinarily meet with Tillman. Tillman would go over the bankruptcy papers with the customer, make sure they understood them, and then tell them where to sign. (<u>Id.</u> at 146:19-22.) If the customer had any questions, Tillman would answer them.

At a third meeting, Tillman would prepare the customers for what would happen at their § 341 meeting of creditors. Tillman would describe the types of questions that the bankruptcy trustee would ask at the § 341 meeting, and told them that the trustee would ask the customers whether or not they had any assistance in preparing their bankruptcy papers. Because Tillman "didn't want to get in trouble" (<u>id.</u> at 147:16-17), Tillman told the customers to tell the trustee that they did not have any help in preparing their bankruptcy case. In addition to Tillman giving this instruction to S&T's customers, Sullivan, Renfro and Scales, in their own contacts with the customers, told them the same thing. When asked to describe the type of trouble he was fearful of, and why he told the customers to tell the trustee that they had no help with their bankruptcy case, Tillman testified it was "because of perjury." (<u>Id.</u> at 148:6-8.)

-28-

Tillman also gave the customers some handouts at this meeting.  Tillman testified that he gave the customers a copy of an instruction sheet (Exhibit 2) that stated with big block letters at the top: "DO NOT TAKE THIS PAGE INTO 211 FORT ST.!!"[16]  This handout contains instructions for taking the required budget and credit counseling course, filing of the bankruptcy papers at the Bankruptcy Court, taking the course in personal financial management, and appearance at the § 341 meeting.  Under the section of the handout entitled "Helpful Hints!!," the handout reads as follows:

### **Helpful Hints!!**

Make copies of all of your paperwork!  You will need to bring the copies to your 341 hearing along with your state ID, and Social Security card. **DO NOT FORGET THESE!!**

Be Calm!  Know your paperwork!  Read your copies at least once a day!  The more knowledge you have about your packets the smoother the hearing will go!

You DID NOT have help with the paperwork!  They will try and ask you many different ways!  Don't let them confuse you!  If you say you had help they will make you pay the 299.00 fee, and dismiss your case!  So no, you had NO help!

They will ask where you got your paperwork from.  You got it off the Eastern Michigan bankruptcy webpage.

The trustee may ask you what "exemptions" are. . .  "Exemptions" are found on your Schedule C.  They are items that are excluded from your bankruptcy, or things that the court cannot take from you.  The laws that protect your things are on schedule c also, they might ask where you got the laws. .  You can find them online, in a law library, etc.  These[] laws can be found anywhere, just let them know you did your own research.

Please make sure that you have given me ALL of your debt that you want included in your bankruptcy.  Any thing that needs to be added after the paperwork is done will be a charge of 75$

If you have ANY questions write them down and call us!

--------------------------------

[16] This is the address of the Bankruptcy Court in Detroit.

When asked why this handout instructed the customer not to take the handout into the Bankruptcy Court on Fort Street, Tillman explained that he "did not want to get in trouble." (Tr. 149:21-23, Oct. 17, 2012, ECF No. 92.) When asked why the "Helpful Hints" instructed the customer to say that they had no help with their bankruptcy case, Tillman elaborated that this was "just to put it on there as a scare tactic so they won't tell on us." (Id. at 153:7-19.)

Tillman also described a second handout that he gave to customers entitled "Review For Bankruptcy 341 meeting of creditor, Research for chapter 7" (Exhibit 3). Tillman created this form to help debtors answer questions that the trustee was likely to ask at the § 341 meeting or, as he described it, "to prepare them for court." (Tr. 154:20-21, Oct. 17, 2012, ECF No. 92.) Tillman stated that he provided this sheet to the debtors at a follow-up meeting that they had with him approximately ten days before the § 341 meeting.

Tillman admitted that in 2010, he knew that the Court entered an order permanently enjoining him from acting as a bankruptcy petition preparer. Once that happened, Tillman began to use the name "Rico," a nickname that Sullivan began calling him once Tillman got "in trouble with the bankruptcy court." (Id. at 157:1-6.) Once Tillman was enjoined by the Consent Judgment, he made Sullivan, Renfro and Scales aware that he was in trouble. Tillman also told the other Respondents that they, too may be getting into trouble with the Bankruptcy Court, and eventually told them that "we'd probably need to take ownership of what we're doing." (Id. at 160:2-5.) With an ever increasing number of proceedings brought by the UST against Tillman because of his activities as a bankruptcy petition preparer, and because of his violations of the order enjoining him, Tillman stopped working at S&T on May 19, 2012. Tillman testified that he has had no involvement with any of the other Respondents since that time.

Tillman did not disagree with any of the UST's allegations during his testimony. He described a very large business that S&T conducted, with a production line style and well-defined roles for each of the Respondents. Tillman did not either explicitly or implicitly contradict any of the testimony by the first eight debtors called to testify by the UST about the help they received from the Respondents in preparing their bankruptcy cases. Tillman's testimony, which essentially amounted to a complete confession, was very credible.

Aleia Renfro was the second Respondent who testified. Renfro corroborated a great deal of Tillman's testimony about S&T, but differed with him regarding her role at S&T and, to some extent, the roles of the other Respondents at S&T. Renfro began by admitting that she was "involved in Mr. Tillman's bankruptcy business." (Id. at 180:14-15.) Renfro came to work at S&T around January, 2009, after answering an ad on Craigslist for a personal assistant. Renfro spoke with Tillman over the telephone and, upon telling him some of her past business experience, Tillman changed her prospective position from personal assistant to marketing. Renfro testified that the marketing involved her going to casinos and to Belle Isle to pass out flyers and business cards. Renfro had her own business card that identified her employer as "S&T Enterprise Consulting Services," and described her title as "Sales" (Exhibit 16). Renfro admitted that she understood that when she was marketing for S&T, she was bringing clients into S&T's business for "bankruptcy services," although she also stated that she was "mainly targeting individuals for driver's license repair." (Tr. at 181:10-17, Oct. 17, 2012, ECF No. 92.)

Despite her insistence that her role was primarily involved in marketing and sales, Renfro conceded that she did perform some other tasks for S&T at its office and, more importantly, that she held herself out as doing much more than passing out flyers and business cards. Renfro testified that

she stated on her Facebook page that she was a "paralegal" employed by S&T, and described her job as "I deal with angry broke ppl all day! It's Fun!" (Exhibit 14 at 3.) She later admitted, however, that she lied about being a paralegal in order "to make [herself] look a bit more credible." (Tr. 206:20-22, Oct. 17, 2012, ECF No. 92.) Renfro also explained that if she was at the office and there was no one at S&T to meet with the client, Renfro would meet with the client, "go over their information sheet with them, make sure that all their documents were there and present." (Id. at 182:13-17.) Renfro later elaborated as follows:

> Every now and then if Mr. Tillman was unavailable I would assist with the clients, with the customers, making sure that their information sheet was filled out correctly, making sure that all the documents were there and ready to go, check stubs, things of that nature, double-checking items, you know, that needed to be put into -- I guess put into a bankruptcy, and then that would pretty much be it. And then, again, when their packets were ready to go, sometimes I would be asked to give them a phone call and let them know that their packets were ready to be picked up.

(Id. at 196:1-16.) Although Renfro denied that she actually prepared bankruptcy papers for customers, she did acknowledge that when a customer showed up to pick up their bankruptcy paperwork, she would "grab" the papers from Tillman's office. (Id. at 183:2-5.) At that point, Renfro said she would show the customer where to sign, but nothing else.

Renfro testified that she took her instructions from Tillman and, although she knows him, Sullivan did not give her instructions while she worked at S&T. Renfro understood that Sullivan handled things "like credit repairs," but stated that she did not know if he was connected with the "bankruptcy aspect of it." (Id. at 195:6-10.) During the time that Renfro worked at S&T, she also acknowledged that she filed her own bankruptcy case on August 19, 2011, and that Tillman assisted her in preparing the papers filing her case. Renfro stated that she received $75.00 to $100.00 from Tillman for each customer that she brought to S&T. Renfro testified that she continued her

-32-

employment with S&T until March, 2012, and further stated that she has not been involved with any of the other Respondents since that time.

Renfro was only asked about one of the debtors who testified: Gibbons. Renfro said that she could not recall meeting Gibbons and was "very surprised" when Gibbons identified her in the courtroom. (Id. at 204:15-24.)

The largest difference between Renfro's testimony and Tillman's testimony was Renfro's insistence that she did not prepare bankruptcy papers for S&T's customers, and her contention that her job was primarily to get customers for S&T. However, Renfro's testimony on this point is undermined by several of her own statements. First, she admitted that she falsely held herself out as a paralegal. She explained that this was done to give her more credibility with customers of S&T. Second, she described her services on Facebook as working with broke people, which suggests more than just passing out flyers to get customers. Third, she admitted that there were instances where she did meet with S&T's customers and go over their bankruptcy paperwork and other documents. In sum, while Renfro was credible in her description of what S&T did, her testimony lacked credibility when she was describing her own role there. She took great pains to emphasize that she did not actually type or fill out bankruptcy papers for the customers, but instead just brought the customers to S&T, and only occasionally went over bankruptcy papers with S&T's customers.

On the second day of the evidentiary hearing, the UST called a third Respondent, Kenneth Scales, to the stand. Scales was a reluctant witness, whose attendance was only procured by sending a United States Marshal to serve him with an order requiring him to appear at the adjourned evidentiary hearing. Scales did not deny that he was also involved in a "bankruptcy business" owned by Tillman. (Tr. 21:3-4, Nov. 15, 2012, ECF No. 93.) Scales referred to Tillman's business

-33-

as Hatz Management, but also said that he was familiar with the name S&T. When asked which of those two business entities Scales was associated with, and which of those business entities handled "bankruptcy work," Scales replied that he was associated with both of them, and both of them handled bankruptcy work. (Id. at 21:11-13.) Scales described his role in the bankruptcy business as handling "promotions and advertising." (Id. at 21:1-2.) Scales was careful in his testimony to confine the description of his role to promotion and advertising. Scales said that he was compensated at the rate of $50.00 for each customer that he brought in to use the "bankruptcy service." (Id. at 22:2-10.)

Scales denied that he pulled credit reports or did anything else for the bankruptcy business other than promotions and advertising. However, he did identify certain exhibits that described the bankruptcy services that he was promoting. One of the advertisements that Scales testified about (Exhibit 10) was posted by him and is titled "Driver's License & Credit Repair (Fresh Start Ch. 7) Street Legal in 8-10 Weeks." That same exhibit, which is dated January 10, 2011, indicates that it was issued by "KB Global Group (Hatz Management)," which Scales described as his "personal e-mail." (Id. at 17:20.) It contains the same telephone number as appeared on one of the other flyers (Exhibit 5) described by Hutchinson when she testified about the flyer that first put her in contact with the Respondents. Exhibit 10 also contains the following information after the line for "Tags": "Chapter 7, bankruptcy, foreclosure, driver's license repair, credit repair, garnishments, warrants, debt relief."

Scales described another advertisement (Exhibit 11) that he placed for Tillman regarding the bankruptcy business that is titled "Low Cost Bankruptcy ($550) Start 2012 Off Right." Scales

-34-

12-44688-pjs    Doc 101    Filed 02/21/13    Entered 02/21/13 16:56:25    Page 34 of 56

described this exhibit as being an advertisement that was "placed for bankruptcy." (Tr. 19:2-3, Nov. 15, 2012, ECF No. 93.) The advertisement described a number of services, including:

LOW COST BANKRUPTCY $550

> Bankruptcy Experts - Come in for a free credit report and consultation and hopefully we can make your financial future brighter . . quickly.
>                 . . .
> Do not trust your financial future with inexperienced attorneys or paralegals as this is a very complicated legal process and your assets may be at risk. We have done over 1000 personal bankruptcies and have never lost an asset. We pride ourselves in caution and professionalism. We have discharged MILLIONS OF DOLLARS for our satisfied clients who regularly refer friends and family. LET US HELP YOU!!!

This advertisement contains the name Kenneth Simmons, which Scales testified was another name that he went by "once upon a time." (Tr. 18:18-19, Nov. 15, 2012, ECF No. 93.) Scales also testified about other advertisements (e.g., Exhibits 2, 18) that he placed that connected him with the bankruptcy business of S&T and the Respondents. Also, like Renfro, Scales testified that he too filed his own bankruptcy case, but stated that he did not have any help in filing it.

Scales admitted that he did promotion and advertising work for a bankruptcy business he described as being owned by Tillman, Hatz Management and/or S&T. Scales did not deny knowing Sullivan, but basically described the bankruptcy business as Tillman's. Scales was not asked any questions about Renfro, nor was he asked any questions about any of the debtors in the Consolidated Cases. Scales' testimony regarding the bankruptcy business conducted by the Respondents is largely consistent with the description of that business by Tillman and Renfro, and reinforces the impression that this was a very extensive bankruptcy business that was widely promoted through advertising and that handled a large number of bankruptcy cases.

-35-

<u>The UST's testimony</u>

In addition to debtors and Respondents, the UST called Karen Riggs to the stand. Riggs is a paralegal employed by the UST. She testified that she is part of a "special project involving bankruptcy petition preparers." (Tr. 208:1-7, Oct. 17, 2012, ECF No. 92.) Riggs reviews referrals when individuals alert the UST that a bankruptcy petition preparer may be involved in a bankruptcy case so that the UST can monitor the case and ensure that the bankruptcy petition preparer is abiding by the requirements of the Bankruptcy Code. Riggs testified she was involved in a very extensive and in-depth review of over 1,000 bankruptcy cases where the UST has tracked the performance and services of bankruptcy petition preparers.

Riggs testified that she has become familiar with the involvement of S&T in many bankruptcy cases. Riggs has identified many common characteristics of the cases in which S&T has been involved. According to Riggs, among the common characteristics of bankruptcy cases in which S&T is involved are: (i) the use of the same company for budget and credit counseling; (ii) the use of the same company for completion of courses in personal financial management; and (iii) the presence of common characteristics on the fonts, terminology, spacing, and entry of information on the bankruptcy papers filed by those debtors who have used S&T's services. Upon observing these common characteristics, Riggs explained that the UST conducts a tracking process in which the UST then sends an attorney to the § 341 meeting to question the debtor regarding the involvement of S&T.

Riggs described a chart (Exhibit 15) that shows 49 separate bankruptcy cases which show common characteristics of cases in which S&T has provided services to the debtors. Among other things, the chart shows the name of the company providing the credit counseling, the name of the

company providing the financial management course, whether or not the schedule E filed in the case listed outstanding tickets or driver responsibility fees and, most telling, whether there are common markings on the face of the schedules and other papers filed in the bankruptcy case indicating preparation of the schedules and papers by the same person. The chart also lists the cases in which the UST had followed up to investigate whether S&T was involved based upon the common characteristics. Riggs explained that the chart shows that the debtors in 15 of these cases admitted that they had assistance in filing their bankruptcy cases, although the chart does not indicate who provided such assistance. (Tr. 212:20, Oct. 17, 2012, ECF No. 92.) Investigation by the UST with respect to the other cases is ongoing. Riggs testified that there is yet new information that the UST has received suggesting that S&T, and at least some of the Respondents, continue to provide assistance to individuals filing pro se bankruptcy cases.

Riggs' testimony was credible and persuasive in supporting the UST's allegations that the Respondents have had an ongoing, extensive business enterprise in which they prepare bankruptcy papers and provide other assistance to individuals filing pro se bankruptcy cases, while attempting to conceal their involvement from the Court.

## Applicable Law

Section 110 of the Bankruptcy Code governs the activity of bankruptcy petition preparers. It "was enacted in 1994 'to protect consumers from abuses of non-lawyer petition preparers.'" In re Ali, 230 B.R. 477, 481 (Bankr. E.D.N.Y. 1999) (quoting Seven Corp. v. U.S. Trustee (In re Fraga), 210 B.R. 812, 818-19 (B.A.P. 9th Cir. 1997)). Section 110(a) defines "bankruptcy petition preparer" as "a person, other than an attorney for the debtor or an employee of such attorney under the direct supervision of such attorney, who prepares for compensation a document for filing[.]"

"Document for filing" in turn is defined in § 110(a)(2) as "a petition or any other document prepared for filing by a debtor in a United States bankruptcy court or a United States district court in connection with a case under [title 11]." Section 110(41) defines "person" as including an individual, a partnership, and a corporation.

The key to whether an individual is a bankruptcy petition preparer lies in the meaning of the word "prepare."

> "[P]reparation" goes beyond the physical typing or mere printing of the documents. Webster's Third New International Dictionary (2002) defines "prepare" as "to make ready beforehand for some purpose." Thus, for example, a person who for a fee provides a computerized service that asks the debtor a series of questions in order to produce a bankruptcy petition and related documents for filing is engaged in the activity of making these documents "ready beforehand." Moreover, such activity would fall within the plain meaning of the statute even if the debtor types his or her own answers to the automated questionnaire and prints the completed forms using the debtor's own printer. This is true because the person providing the computerized or automated service is engaged in the activity of making ready or "preparing" the debtor's petition and other documents.

In re Thomas, 315 B.R. 697, 703-04 (Bankr. N.D. Ohio 2004) (agreeing with In re Jolly, 313 B.R. 295, 300 (Bankr. S.D. Iowa 2004) and finding that "[t]he fact that the person does not place the data and numbers on the form does not excuse that person from advising the court of their participation in the process of preparing the documents for filing with the bankruptcy court" and concluding "that 'preparation' of a document includes both the physical preparation and the dictation or determination of the information to be placed on the document by the 'preparer'"). "Virtually any exercise of discretion about what to include or not include in the bankruptcy documents, will touch upon a bankruptcy 'procedure' or 'right.'" In re Hennerman, 351 B.R. 143, 151-52 (Bankr. D. Colo. 2006) (emphasis and citation omitted). "[P]roviding even 'generic' explanations constitute[s] the

-38-

unauthorized practice of law . . . ." <u>In re Rose</u>, 314 B.R. 663, 705 (Bankr. E.D. Tenn. 2004) (finding such explanations constitute the unauthorized practice of Tennessee law).

> "So what does § 110 tacitly permit? The answer in a nutshell is 'not much.' Section 110 itself proscribes virtually all conduct falling into the category of guidance or advice, effectively restricting "petition preparers" to rendering only 'scrivening/typing' services. Anything else – be it suggesting bankruptcy as an available remedy for a debtor's financial problems . . . will invariably contravene either state laws proscribing the unauthorized practice of law or other more specific provisions of § 110. The only service that a bankruptcy petition preparer can safely offer and complete on behalf of a pro se debtor after enactment of § 110 is the 'transcription' of dictated or handwritten notes prepared by the debtor prior to the debtor having sought out the petition preparer's service."

<u>In re Warfield</u>, No. 09-75993, slip op. at 5 (Bankr. E.D. Mich. March 5, 2010) (quoting <u>In re Guttierez</u>, 248 B.R. 287, 297-98 (Bankr. W.D. Tex. 2000)); <u>see also</u> <u>McDermott v. Hills</u> (<u>In re Grissett</u>), Adv. No. 07-4210, 2008 WL 4553083, at *2-3 (Bankr. E.D. Mich. Oct. 8, 2008) (exploring the term "prepares" and finding that the defendant was a bankruptcy petition preparer even though he "no longer physically filled out his clients' petitions" because he "continued to meet with clients, . . . advise them regarding exemptions, . . . provide consulting services . . . and explain the bankruptcy process").

Other subsections of § 110 describe the obligations of a bankruptcy petition preparer, and there are many, as well as prohibited conduct. Sections 110(h) through (*l*) detail sanctions for violations, including the disallowance of any fees received, actual damages, fines (in some cases trebled), and attorneys' fees and costs. <u>See</u> <u>Hills v. McDermott</u> (<u>In re Wicker</u>), 702 F.3d 874, 877-78 (6th Cir. 2012). Section 110(j) authorizes a civil action to enjoin a bankruptcy petition preparer from certain conduct.

-39-

### General Findings of Fact and Conclusions of Law Regarding the Respondents

The evidentiary record made by the UST regarding the nature and extent of the Respondents' activities is impressive.  Based upon that evidence, the Court makes the following findings of fact regarding the Respondents and their activities.  In 2009, Tillman and Sullivan formed a business that they called S&T Enterprise.  "S" stood for Sullivan, "T" for Tillman.  S&T operated out of rented space at Twelve Mile and Van Dyke.  Together, Sullivan and Tillman, and eventually the other Respondents, built an extensive business enterprise helping individuals without an attorney prepare and file bankruptcy cases.

Their business model resembled a production line.  Flyers were distributed at gas stations, liquor stores and other places.  The flyers offered services for driver license repair and credit repair.  Those services were nothing more than code for filing bankruptcy.  When a potential customer called one of the telephone numbers on a flyer, they spoke to a person who would then set up an initial appointment.  At this appointment, the potential customer would fill out an intake form with various information that was then used to complete papers for filing a bankruptcy case.  The customer would then sign a contract and pay a fee.  After attending this initial appointment, the customer would come back for another appointment to pick up their bankruptcy papers.  Tillman or Sullivan would go over the bankruptcy papers with the customer.  The customer was then given an instruction sheet telling them how to file their bankruptcy case and, importantly, giving them very explicit instructions not to tell anyone at the Bankruptcy Court that they had received any help preparing their bankruptcy case.  After filing their bankruptcy case, the customer would come in for one more appointment before their § 341 meeting of creditors, at which time Tillman would review

-40-

with them what they should say at the § 341 meeting, again emphasizing that they should not tell anyone at the Bankruptcy Court that they had any help in preparing and filing their bankruptcy case.

Although the business was started by Tillman and Sullivan, soon they had help from the other Respondents. Renfro was hired in 2009 initially to do some promotion and marketing, but wound up doing much more. Before long, Renfro's job evolved into actually preparing bankruptcy papers for many of S&T's customers. Each week she would pick up intake forms filled out by customers from a bin located in Tillman's office, use those intake forms to prepare bankruptcy papers, and bring the completed bankruptcy papers back the following week. The customer would then pick up their bankruptcy papers when they met with Tillman or Sullivan. To help give her credibility with S&T's customers, Renfro falsely represented to them that she was a paralegal.

Scales came aboard in 2010 and handled promotion and marketing, which basically meant distributing flyers and answering telephones. On occasion, he also handled intake interviews with customers, answering their questions and, on at least one occasion, took an online credit counseling course for a customer.

The Respondents did a high volume business at S&T. Although the precise number of customers is uncertain, there is uncontroverted evidence that it was somewhere between five and eight customers per week. Those customers generated substantial fees for S&T. S&T charged each customer a fee ranging between $500.00 and $600.00. The fee was split among the Respondents roughly as follows: Sullivan, $150.00; Tillman, $125.00 to $150.00; Scales, $100.00; and Renfro somewhere between $75.00 to $100.00. This fee was far in excess of the reasonable value of any services that the Respondents provided to their customers.

-41-

The Respondents worked hard to hide their lucrative business. By having each of the Respondents play different roles with S&T's customers, the customers did not actually see their bankruptcy papers being completed. Instead, they filled out intake forms, then came back and picked up the bankruptcy paperwork which was already prepared by Renfro based on the intake forms. That way, the individual debtors would not be able to testify that they had actually witnessed someone filling out their bankruptcy papers. The Respondents did not sign or file either the Local Declarations or the required Official Form B19s.

It was standard operating procedure for the Respondents to coach their customers not only to hide the Respondents' activities, but then to lie to the Bankruptcy Court under oath both in the papers required to be filed and again in person at the § 341 meetings. To be sure that their activities did not see the light of day, the Respondents repeatedly emphasized to their customers that they should not tell the Bankruptcy Court anything about S&T or the Respondents. Instead, the Respondents tried to scare their customers into believing that they would be the ones to get into trouble if they were to honestly tell the Bankruptcy Court about the help they had from the Respondents in preparing their bankruptcy cases. The Respondents' customers followed their instructions. They filed multiple false statements with the Court and lied under oath in person at the § 341 meetings when asked if they had any help in filing their bankruptcy cases.

On July 21, 2010, the Court entered the Consent Judgment enjoining Tillman from further activity as a bankruptcy petition preparer. Instead of abiding by the Consent Judgment, Tillman continued business as usual with the Respondents, only now using the name Rico instead of his own name, in a further attempt to conceal his actions. The Respondents' bankruptcy business continued unabated after Tillman was enjoined by the Consent Judgment.

-42-

The mountain of evidence in the record overwhelmingly establishes that all of the Respondents were deeply and continuously involved in a very substantial, ongoing, pervasive business enterprise helping individuals without an attorney file bankruptcy cases in the Eastern District of Michigan and charging them excessive fees for their services.

The Court makes the following conclusions of law. Each of the Respondents have engaged continuously in activities involving the preparation of bankruptcy petitions and bankruptcy cases within the meaning of § 110 of the Bankruptcy Code. The Respondents dispense information about bankruptcy. They recruit individuals to file bankruptcy. They advise individuals whether to file bankruptcy. They provide intake forms to gather information needed to file bankruptcy. They complete the bankruptcy petition and other required documents for their customers. They tell their customers what to say or not to say at the § 341 meeting once their case is filed. All of these activities are unquestionably part and parcel of preparing a bankruptcy petition and a bankruptcy case. All of their activities go to the essence of preparing a bankruptcy case, irrespective of whether any individual Respondent actually filled out a bankruptcy petition in any given case. Playing a shell game to keep their customers from seeing them fill out the actual documents does not mean that the Respondents are not acting as bankruptcy petition preparers. The Court explicitly rejects the Respondents' disingenuous contention, alluded to from time to time throughout the evidentiary hearing, that they are somehow not bankruptcy petition preparers because none of the debtors who testified could actually say that they witnessed the Respondents fill out their bankruptcy papers. As a matter of law, all of the Respondents are bankruptcy petition preparers, and have acted as bankruptcy petition preparers in cases that are too numerous to count from 2009 through 2012.

-43-

Their activities constitute preparation of bankruptcy petitions and bankruptcy cases within the meaning of § 110.

**Specific Findings of Fact and Conclusions of Law**
**<u>Regarding the UST's Motions in the Consolidated Cases</u>**

Based upon the evidence received at the hearing, the Court makes the following specific findings of fact and conclusions of law regarding the UST's motions in the Consolidated Cases. The Court will first address the four Consolidated Cases in which the debtors testified at the evidentiary hearing. The Court will then address the remaining Consolidated Cases.

<u>Alexandria Hutchinson</u>

Hutchinson filed her pro se bankruptcy case on February 29, 2012. On the same day, she filed a Local Declaration stating that she did not have any help and she did not pay anyone for any help with her case. On April 6, 2012, Hutchinson filed an amended Local Declaration stating that she did have help, she paid Sullivan $500.00, and that he refused to sign. Hutchinson testified credibly at the hearing.

All four of the Respondents played a role in helping Hutchinson prepare her bankruptcy case. Hutchinson paid $500.00 for the services rendered by the Respondents in preparing her bankruptcy petition. The Respondents, acting in concert together, instructed Hutchinson to falsely state that she did not have any help in preparing her bankruptcy case and that she did not pay anyone for help. The documents filed in Hutchinson's case bear characteristics common to the documents filed in other bankruptcy cases which S&T provided services to pro se debtors. The testimony and arguments by some of the Respondents that they were not the individual who actually filled out Hutchinson's bankruptcy papers is unpersuasive. It is irrelevant that Hutchinson did not actually see who filled out her bankruptcy petition and bankruptcy documents because the evidence

-44-

overwhelmingly shows that each of the Respondents engaged in activity to help Hutchinson prepare her bankruptcy petition and other documents for filing, either by giving Hutchinson information about whether to file bankruptcy, what to include in such papers, filling the papers out, telling Hutchinson how to fill the papers out, or telling Hutchinson how to answer questions about the papers once in court or at the § 341 meeting. The Court finds that all four of the Respondents acted as bankruptcy petition preparers for Hutchinson.

There are multiple remedial provisions in § 110. The UST only seeks relief in the Consolidated Cases under § 110(*l*) and (i).[17] Section 110(*l*)(1) authorizes the Court to fine a bankruptcy petition preparer who fails to comply with § 110(b), (c), (d), (e), (f), (g) or (h) not more than $500.00 for each failure. The statute does not specify criteria for the Court to consider in fixing the amount of the fine, but appears to leave it to the Court's discretion. The UST alleges that each of the Respondents failed to comply with § 110(b), (c) and (e), and requests the Court to impose the maximum fine of $500.00 on each Respondent "jointly and severally" for each violation.

The UST alleges that the Respondents each violated § 110(b) by not signing any of the documents they helped Hutchinson prepare for filing in her case. Section 110(b)(1) provides that "[a] bankruptcy petition preparer who prepares a document for filing shall sign the document[.]" None of the Respondents signed the documents that they helped Hutchinson prepare. Therefore, all four Respondents violated § 110(b)(1). The Court agrees with the UST that the maximum fine amount is appropriate in this case because of the egregious, continuing pattern of behavior by the

---

[17] At the Court's request, the UST filed in the Hutchinson case (case no. 12-44688, ECF No. 89) a summary of the relief requested in each of the Consolidated Cases.

Respondents acting as bankruptcy petition preparers in some of the Consolidated Cases, and according to the UST's chart (Exhibit 15), in many others as well.

The UST alleges that the Respondents each violated § 110(c) because the Respondents did not disclose their identity, address, telephone number or social security number in the documents that they helped Hutchinson prepare and file in this case. Section 110(c)(1) provides that "[a] bankruptcy petition preparer who prepares a document for filing shall place on the document, after the preparer's signature, an identifying number that identifies individuals who prepared the document." Section 110(c)(2)(A) provides that "the identifying number of a bankruptcy petition preparer shall be the Social Security account number of each individual who prepared the document or assisted in its preparation." None of the Respondents disclosed the required information under § 110(c)(1) or (2). Therefore, all four of the Respondents violated § 110(c). The UST again requests that the Court impose the maximum fine of $500.00. The Court agrees that this amount is appropriate in the circumstances of this case.

The UST alleges that the Respondents each violated § 110(e) because they gave Hutchinson legal advice. Section 110(e)(2)(A) provides that "[a] bankruptcy petition preparer may not offer a potential bankruptcy debtor any legal advice[.]" Section 110(e)(2)(B) defines "legal advice" as including advice on "whether [ ] to file a petition under [title 11]" and advice "concerning bankruptcy procedures and rights." The Respondents all advised Hutchinson whether to file a bankruptcy petition and provided legal advice to Hutchinson concerning bankruptcy procedures and rights. Therefore, all four Respondents violated § 110(e). The UST again requests the Court to impose the maximum fine of $500.00. The Court agrees that this amount is appropriate in the circumstances of this case.

The UST also requests that the Court triple the fines assessed in this case against the Respondents pursuant to § 110(*l*)(2)(D). Section 110(*l*)(2)(D) states that the Court "shall triple the amount of a fine assessed under [this paragraph] in any case in which the court finds that a bankruptcy petition preparer . . . (D) prepared a document for filing in a manner that failed to disclose the identity of the bankruptcy petition preparer." All four Respondents helped Hutchinson prepare documents for filing in her case in a manner that failed to disclose their identity. Worse yet, the Respondents affirmatively advised Hutchinson to conceal their identity. The Court is therefore required by § 110(*l*)(2)(D) to triple the fines imposed on against each of the Respondents. The Court has found three separate violations, each with a $500.00 fine. The trebling required by § 101(*l*)(2) produces a total fine of $4,500.00 against each Respondent.

In addition to the fines described above, the UST requests that the Court award damages to Hutchinson because the Respondents' violations of § 110 were "fraudulent, unfair, or deceptive." Section 110(i)(1) states that "[i]f a bankruptcy petition preparer violates [§ 110] or commits any act that the court finds to be fraudulent, unfair, or deceptive," then the Court

> shall order the bankruptcy petition preparer to pay to the debtor
> (A) the debtor's actual damages;
> (B) the greater of
>     (i) $2,000; or
>     (ii) twice the amount paid by the debtor to the bankruptcy petition preparer
>     for the preparer's services; and
> (C) reasonable attorneys' fees and costs in moving for damages under this
> subsection.

There is no doubt that the conduct of the Respondents in directing Hutchinson to make false oaths in her case was "fraudulent," "unfair," and "deceptive." It requires an award of damages under § 110(i)(1). The only question is how much. Because there is no evidence in the record of any actual damages to Hutchinson, nor any evidence of reasonable attorney fees, then the damages are

limited to the greater of $2,000.00 or twice the amount paid by Hutchinson to the Respondents. In this case, Hutchinson paid $500.00. When doubled, that sum is still less than $2,000.00. Therefore, the statutory provision in § 110(i)(1)(B) requires the payment of $2,000.00 of damages.

The UST has requested relief against the Respondents jointly and severally. That makes sense when applied to an award of damages, because a debtor will be made whole once the amount of damages has been paid and should not be entitled to multiple recoveries. But it does not make sense to impose fines jointly and severally. Under the statute, the fines are not payable to the debtor, but instead are payable to the UST. They are not compensatory in nature, but instead are punitive in nature for violating the statute. Because each of the Respondents have failed to comply with the statute, thus warranting the fines, the Court holds that each of the Respondents must be individually fined, so that each of them is responsible to pay $4,500.00 of fines rather than being jointly and severally responsible for $4,500.00 of fines in the aggregate. The Court will enter an order in the Hutchinson case imposing a fine in the amount of $4,500.00 against each Respondent, and awarding damages to Hutchinson in the aggregate amount of $2,000,00 against the Respondents, jointly and severally.

## Camille Gray

On February 29, 2012, Gray filed her bankruptcy case pro se. On the same day, she filed a Local Declaration stating that she did not have any help and she did not pay anyone for help with her case. On April 9, 2012, Gray filed an amended Local Declaration that said that she did have help, and that she paid $500.00 for this help. Gray did not identify the person who helped her, nor list an address or telephone number for such person on her amended Local Declaration. Gray testified credibly at the hearing.

-48-

All four of the Respondents played a role in helping Gray prepare her bankruptcy case. Gray paid $500.00 for the services rendered by the Respondents for preparing her bankruptcy petition. The Respondents, acting in concert together, instructed Gray to falsely state that she did not have any help in preparing her bankruptcy case and that she did not pay anyone for help. The documents filed in Gray's case bear characteristics common to the documents filed in other bankruptcy cases in which S&T provided services to pro se debtors. The Court finds that all four of the Respondents acted as bankruptcy petition preparers for Gray.

The Respondents violated § 110(b)(1) by not signing the documents that they helped Gray prepare and by not disclosing their name and address. The Respondents violated § 110(c) because they did not disclose their identity or social security number in the documents that they helped Gray prepare and file. The Respondents violated § 110(e)(2)(A) by giving Gray legal advice. For the same reasons explained above with respect to Hutchinson, the Court fines the Respondents $500.00 for each of these violations pursuant to § 110(*l*)(1), for a total of $1,500.00, and then triples that fine to $4,500.00 pursuant to § 110(*l*)(2). Further, for the same reasons explained above with respect to Hutchinson, the Court finds that the conduct of the Respondents in this case was "fraudulent," "unfair" and "deceptive," and therefore awards damages to Gray in the amount of $2,000.00 against the Respondents pursuant to § 110(i)(1)(B).

The Court will enter an order in the Gray case imposing a fine in the amount of $4,500.00 against each Respondent, and awarding damages to Gray in the aggregate amount of $2,000.00 against the Respondents, jointly and severally.

<u>Ebonye S. Strong</u>

On February 16, 2012, Strong filed her bankruptcy case pro se. On the same day, she filed a Local Declaration stating that she did not have any help and she did not pay anyone for help with her case. Strong testified credibly at the hearing.

Sullivan, Tillman and Renfro each played a role in helping Strong prepare her bankruptcy case, but Scales did not. Strong testified that Sullivan told her that she would be contacted by a "young lady" to discuss her paperwork, and Strong recalled that she was contacted by a "young lady," but she did not remember her name or the questions the "young lady" asked about Strong's paperwork. Based on Tillman's testimony that Renfro was the only person associated with S&T who prepared the bankruptcy documents, the Court draws the inference that the "young lady" was Renfro.

There was no mention of Scales at all in Strong's testimony. The Court cannot draw any inference about his involvement in Strong's case. Strong paid $670.00 for the services rendered by Sullivan, Tillman and Renfro in preparing her bankruptcy petition. Sullivan, Tillman and Renfro, acting in concert together, instructed Strong to falsely state that she did not have any help in preparing her bankruptcy case and that she did not pay anyone for help. Strong is also referenced in the chart (Exhibit 15) prepared by Riggs, listing Strong's case as having characteristics common to cases in which S&T has provided services to pro se debtors. The Court finds that Sullivan, Tillman and Renfro acted as bankruptcy petition preparers for Strong, but Scales did not.

Sullivan, Tillman and Renfro violated § 110(b)(1) by not signing the documents that they helped Strong prepare. Sullivan, Tillman and Renfro violated § 110(c) because they did not disclose their identity or social security number in the documents that they helped Strong prepare and file.

-50-

Sullivan, Tillman and Renfro violated § 110(e)(2)(A) by giving Strong legal advice.  For the same reasons explained above with respect to Hutchinson, the Court fines Sullivan, Tillman and Renfro $500.00 for each violation pursuant to § 110(*l*)(1), for a total of $1,500.00, and then triples that fine to $4,500.00 pursuant to § 110(*l*)(2).  Further, for the same reasons explained above with respect to Hutchinson, the Court finds that the conduct of Sullivan, Tillman and Renfro in this case was "fraudulent," "unfair" and "deceptive," and, therefore, awards damages to Strong in the amount of $2,000.00 against Sullivan, Tillman and Renfro pursuant to § 110(i)(1)(B).

The Court will enter an order in the Strong case imposing a fine in the amount of $4,500.00 against each of Sullivan, Tillman and Renfro, and awarding damages to Strong in the aggregate amount of $2,000.00, jointly and severally, and denying the UST's motion for relief against Scales in this case.

### Derrick Hopkins

On March 20, 2012, Hopkins filed his bankruptcy case pro se.  On the same day, he filed a Local Declaration stating that he did not have any help and he did not pay anyone for help with his case.  Hopkins testified credibly at the hearing.

Sullivan, Tillman and Renfro each played a role in helping Hopkins prepare his bankruptcy case.  Hopkins made no mention of Scales in his testimony.  There is insufficient evidence for the Court to make any finding about his involvement in Hopkins' case.  Hopkins paid $600.00 for the services rendered by Sullivan, Tillman and Renfro in preparing his bankruptcy petition.  Sullivan, Tillman and Renfro, acting in concert together, instructed Hopkins to falsely state that he did not have any help in preparing his bankruptcy case and that he did not pay anyone for help.  The documents filed in Hopkins' case bear characteristics common to documents filed in other

bankruptcy cases in which S&T has provided services to pro se debtors. The Court finds that Sullivan, Tillman and Renfro acted as bankruptcy petition preparers for Hopkins, but Scales did not.

Sullivan, Tillman and Renfro violated § 110(b)(1) by not signing the documents that they helped Hopkins prepare. Sullivan, Tillman and Renfro violated § 110(c) because they did not disclose their identity or social security number in the documents that they helped Hopkins prepare and file. Sullivan, Tillman and Renfro violated § 110(e)(2)(A) by giving Hopkins legal advice. For the same reasons explained above with respect to Hutchinson, the Court fines Sullivan, Tillman and Renfro $500.00 for each violation pursuant to § 110(*l*)(1), for a total of $1,500.00, and then triples that fine to $4,500.00 pursuant to § 110(*l*)(2). Further, for the same reasons explained above with respect to Hutchinson, the Court finds that the conduct of Sullivan, Tillman and Renfro in this case was "fraudulent," "unfair" and "deceptive," and, therefore, awards damages to Hopkins in the amount of $2,000.00 pursuant to § 110(i)(1)(B).

The Court will enter an order in the Hopkins case imposing fines in the amount of $4,500.00 against Sullivan, Tillman and Renfro, and awarding damages to Hopkins in the aggregate amount of $2,000.00 against them, jointly and severally.

Anthony Dwayne Goodson,
Cathleen Lickner and
<u>Robert A. Owens</u>

Goodson, Lickner and Owens are each debtors in the Consolidated Cases. None of them testified at the evidentiary hearing, nor did any of the witnesses even mention these debtors. The only evidence in the record connecting Goodson, Lickner or Owens to the Respondents consists of the reference in the chart (Exhibit 15) prepared by Riggs that lists their cases as having documents filed with characteristics that are common to cases in which S&T has provided services to pro se

-52-

debtors. The chart also indicates that Goodson, Lickner and Owens admitted in their § 341 meeting that they had help in filing their petition. But the identity of the person or entity that provided that help is not indicated on the chart or otherwise in evidence. The bare inclusion of Goodson's, Lickner's and Owen's cases in this chart is not sufficient for the Court to make a finding of fact or conclusion of law that all or any of the Respondents acted as a bankruptcy petition preparer for Goodson, Lickner or Owens.

The Court will enter an order denying the UST's motion for relief against the Respondents in the cases of Goodson, Lickner and Owens.

### Marvin Wiseman

Wiseman is a debtor in one of the Consolidated Cases. He did not testify at the evidentiary hearing nor did any of the witnesses even mention him. The only evidence in the record connecting Wiseman to the Respondents is the inclusion of an unfiled copy of schedule C with his name on it, as part of Exhibit 4. During the evidentiary hearing on October 17, 2012, the UST questioned Tillman briefly about Exhibit 4. Tillman recognized his hand-writing on the copy of this Schedule C, and testified that the notations on the other four pages that make up Exhibit 4 "pretty much" looked like his hand-writing. (Tr. at 156:10-12, Oct. 17, 2012, ECF No. 92.) He acknowledged that he generally made notations on S&T's customers' documents at their final meeting. When asked if it was fair to say that the documents in Exhibit 4 were the Schedule Cs of S&T customers, Tillman responded yes, but he was not certain who these particular customers were.

Without some other evidence connecting Tillman to Wiseman, the Court finds that the inclusion of only one page of an unfiled Schedule C with Wiseman's name on it in an exhibit is not by itself sufficient for the Court to make a finding of fact that all or any of the Respondents acted

as a bankruptcy petition preparer for Wiseman.  The Court will enter an order denying the UST's

motion for relief against Tillman in the Wiseman case.

Brian L. Moore, Jr.,<br>
Dominic Moorer,<br>
Angela Denise Walker,<br>
Lamont Lashawn Walker, and<br>
<u>Devin Deshawn Wilkerson</u>

The last group of Consolidated Cases for the Court to address are the five cases where the

UST seeks to compel Tillman's compliance with orders already entered by the Court.  None of the

debtors in these cases testified.  In each of these cases, unlike the other Consolidated Cases, the UST

does not seek relief under § 110 of the Bankruptcy Code.  The UST previously filed a motion in each

of these cases for an order assessing fines and sanctions under § 110 against Tillman.  The Court

entered an order granting the motion against Tillman in each of these cases.  The UST now only

seeks relief against Tillman, and not against the other Respondents, in the form of an order requiring

Tillman to comply with the orders previously entered in these cases.

In each of these cases, the analysis is the same.  The Court entered orders granting the UST's

motion.[18]   In four of the cases, (Moore, Moorer, Angela Denise Walker and Lamont Lashawn

Walker), Tillman was ordered to appear "to certify and produce evidence that the payments ordered

herein have been made, or alternatively show cause why the payments have not been made."  In

Wilkerson's case,  Tillman was ordered to file an affidavit attesting that he either fully complied

with the payment requirements, or provide a full and detailed explanation of why he has not so

---

[18] The orders were entered in the following cases: April 20, 2012 in Moore's case (ECF
No. 25 in case no. 11-70573); April 17, 2012 in Moorer's case (ECF No. 22 in case
no. 12-41368); May 21, 2012 in Angela Walker's case (ECF No. 22 in case no. 11-69551); April
20, 2012 in Lamont Walker's case (ECF No. 23 in case no. 12-40177); and April 15, 2012 in
Wilkerson's case (ECF No. 24 in case no. 12-40279).

complied. The hearings were adjourned to coincide with the evidentiary hearing set in the Consolidated Cases. But the UST did not question Tillman concerning his compliance with any of these orders. Nor is there any other evidence in the record to show whether Tillman has complied with these orders. The Court cannot make any finding that Tillman either is, or is not, in compliance with the orders in these cases. However, Tillman of course remains obligated to comply with all Court orders.

The Court will enter an order denying the UST's motion for relief against Tillman in these cases without prejudice to the UST's rights to seek appropriate remedies against Tillman for non-compliance.

### Conclusion

The UST has proven that the Respondents are serial violators of § 110 of the Bankruptcy Code. They prey upon vulnerable individuals without an attorney and charge them outrageous fees for services under the guise of "helping" them prepare a bankruptcy petition and other bankruptcy documents. Their services have little or no value to such debtors, and their fees greatly exceed the presumptive maximum allowable fee for a bankruptcy petition preparer. The Respondents thumb their noses at the Bankruptcy Court, the Bankruptcy Code, and the Federal Rules of Bankruptcy Procedure at every turn. They disregard the duty of every bankruptcy petition preparer to file Official Form B19, and every bankruptcy petition preparer in the Eastern District of Michigan to file a Local Declaration. Worse yet, the Respondents use scare tactics with their own clients to get them to lie to the Bankruptcy Court to cover up the Respondents' activities.

The Respondents' clients or, more accurately, their victims, file bankruptcy with little comprehension that they have invoked a judicial proceeding that is governed by laws and rules, and

is predicated upon full and truthful disclosures. They soon learn that the Respondents' superficially clever attempts to conceal the Respondents' conduct has severe consequences for them. They are asked questions about the untruthful declarations they have filed with the Court. They learn that the remedy for those untruthful declarations may be litigation against them, ultimately resulting in a denial of their discharge and the loss of any benefit of their bankruptcy case. Some help.

The evidence demonstrates that the UST is entitled to the relief it seeks in the Consolidated Cases, to the extent set forth in this opinion, and will enter a separate order in each of the Consolidated Cases either granting or denying the UST's motion consistent with this opinion.[19]

.

**Signed on February 21, 2013**

                                    **/s/ Phillip J. Shefferly**
                                    **Phillip J. Shefferly**
                                    **United States Bankruptcy Judge**

---

[19] The Court is mindful that a number of the debtors testified who are not debtors in the Consolidated Cases. Because the UST did not request relief in their cases, the Court makes no award in such cases.

-56-